IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

B & K MECHANICAL, INC.,

            Plaintiff,

    vs.                     **Case No. 03-4149-RDR**

MARK WIESE, et al.,

            Defendants.

_____

**<u>MEMORANDUM AND ORDER</u>**

This is a diversity action arising from an employment relationship between B & K Mechanical, Inc.(B&K) and Mark Wiese. This matter is presently before the court upon the motions for summary judgment filed by Wiese and Forrest Martinson d/b/a Contract Welding. Having carefully considered the arguments of the parties, the court is now prepared to rule.

B&K raises three claims in this action: (1) Wiese engaged in the business of buying and selling scrap metal during his employment with B&K without its consent; (2) B&K paid for goods and services not provided by Martinson, who retained some of the money and paid the rest to Wiese; and (3) Wiese breached fiduciary duties owed to B&K by forming Wiese Mechanical, Inc. and competing with B&K after he resigned. Defendant Martinson has asserted a counterclaim for monies owed by B&K for services rendered.

In the instant motions, the defendants contend they are entitled to summary judgment on all of the claims raised by B&K.

They assert that most of the facts, even if proved, do not support a recognizable legal claim.  They further argue that, even where a recognizable claim is made, the facts do not support the claim. Defendant Martinson also seeks summary judgment on his counterclaim.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  The requirement of a genuine issue of fact means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Essentially, the inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. Id. at 251-52.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  This burden may be met by showing that there is a lack of evidence to support the nonmoving party's case.  See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact left

for trial.  See Anderson, 477 U.S. at 256.  A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials of [its] pleading, but must set forth specific facts showing that there is a genuine issue for trial. Id.  Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  See id.  The court must consider the record in the light most favorable to the nonmoving party.  See Bee v. Greaves, 744 F.2d 1387, 1396 (10th Cir. 1984), cert. denied, 469 U.S. 1214 (1985).  The court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."  Celotex, 477 U.S. at 327 (quoting Fed.R.Civ.P. 1).

     Bob Howard formed B&K, a Kansas corporation, in 1995.  Howard had previously worked as a mason.  B&K was starting to do masonry work for Iowa Beef Packing, Inc.(IBP).  Howard hired Ron Loggins to handle the millwright work.  The business had two divisions: a millwright division and a masonry division.  B&K hired Wiese as a foreman in the millwright division in 1997.  In 1999, Wiese was promoted to project manager of the millwright division.  Wiese's job consisted of bidding jobs, managing jobs and buying materials. Wiese handled a number of projects, including those performed for Tyson Fresh Meats, Inc., formerly known as IBP(sometimes referred

to as Tyson/IBP).  Martinson provided contract labor for millwright jobs.  B&K used Martinson to supply temporary laborers.  Wiese served his notice of resignation upon B&K on May 23, 2003, designating June 6, 2003 as his last day of employment.

I.

A. SCRAP METAL

In the pretrial order, B&K alleges this claim as follows:

> Wiese also had a business involving the sale of scrap metal while working as a B&K employee, Wiese utilized other B&K employees he was supervising to assist him in his scrap metal business.  Wiese sold the scrap metal to Alters Trading Corporation for a profit.  Wiese did not obtain approval from Mr. Howard to continue this scrap metal business.  Wiese did not obtain approval from Mr. Howard to utilize B&K employees in his scrap metal business.  Wiese's sale of scrap metal, and use of B&K employees in the business, constituted a violation of his duties as an employee of B&K.

The following facts concerning this claim appear uncontroverted.  Wiese engaged in a scrap iron business during his employment with B&K.  This business was conducted at job sites where B&K was employed.  The scrap iron came from materials that were removed from the sites where B&K was working.  Wiese had a trailer that he parked at the job site, and scrap iron materials were loaded on it.  Howard was aware of Wiese's scrap iron business and generally had no problem with it.  He never told Wiese to discontinue the business.

The court shall begin with plaintiff's initial contention that Wiese conducted the scrap iron business without the consent of B&K.

4

Wiese has offered evidence that he addressed this issue with Howard prior to his employment with B&K. Howard disputes that conversation, so the court cannot grant summary judgment to Wiese on that basis. However, during his deposition, Howard made it clear that he was aware of Wiese's scrap metal business and he had no objection to it. He admitted that he never told Wiese to discontinue it.

The next issue concerns whether Wiese improperly used B&K employees to assist him in the scrap metal business. This matter requires a careful examination of the facts provided by both parties. There is no dispute that B&K employees cut up scrap metal that was later sold by Wiese. Howard recognizes in his deposition that B&K had an obligation to remove scrap iron from locations where they were working. This was part of their contractual obligation to remove scrap iron materials and then rebuild the area. He further acknowledges that B&K acted in compliance with the request of the companies they were working for in handling scrap iron after it was removed.

To create an issue of fact, B&K relies primarily upon the following: (1) Wiese admitted to the use of B&K employees to cut up scrap metal at the Tyson/IBP Council Bluffs plant; (2) Wiese suggested that he did so at the direction of Jeff Johnson, an engineer who worked for Tyson/IBP; and (3) Johnson testified in his deposition that he had no recollection of B&K employees cutting up

scrap metal for Wiese.  In response, Wiese provided an affidavit
from Johnson that purportedly clarified his responses during his
deposition.  He states in the affidavit that he never saw Wiese use
B&K employees to cut scrap for Wiese rather than for B&K as part of
a B&K job.  B&K has suggested that the presentation of the
affidavit is improper.  B&K argues that statements in the affidavit
contradict Johnson's deposition testimony and create a disputed
material fact on this issue.

The court shall first turn to Johnson's deposition.  There, he
responded as follows:

    Q: Did Mr. Wiese every buy scrap iron from IBP?
    A: Yes.
    Q: During what period of time?
    A: A long time.  The late 80's, early 90's through present.
    Q: Did he buy scrap iron from IBP during the period of time
    that he was working for B&K?
    A: Yes.
    Q: Were you involved in selling scrap iron to him?
    A: He had a trailer available, only on that we put it on, and
    he bought it and hauled it off.
    Q: When you say "he had a trailer available," he had an
    available trailer there at the —-
    A: That he left there all the time.
    Q: At the Council bluffs plant?
    A: Yes.  That way we wouldn't have to throw it on the ground.
    We could get it up and get out of there.
    Q: And it started apparently in the early 90's and has
    continued to date--is that accurate?
    A: Yes

        .        .        .        .        .

    Q: In terms of putting the scrap iron onto the trailer.
    Before it was put on the trailer, did it need to be cut up?
    A: Yes, some of it.
    Q: Who did that?
    A: Either my guys or sometimes he would.
    Q: Did B&K employees cut up scrap iron for Mr. Wiese?
    A: I don't know.

Q: You don't have any recollection one way or the other?
A: No.
Q: Did you understand the scrap iron business to be Mr. Wiese's business, as opposed to the business of B&K?
A: Yes.

In his affidavit, Johnson added the following:

6.  When B&K did millwright work resulting in scrap items being removed from the premises, that job included cutting scrap and stacking it on the trailer.  In such cases, B&K employees were involved in the cutting of scrap and loading it on the trailer because that was part of the job B&K was hired to do.
7.  Some of the B&K millwright jobs at the Council Bluff, Iowa plant were done on a time and materials basis and other jobs were done on a bid basis.  Whenever work was done a time and materials basis, B&K was paid the regular hourly rate for the work that the employees did in cutting and loading scrap.  Whenever B&K made a bid for a job that would generate scrap, it was understood that part of the job that B&K was bidding to do was to remove scrap and stack it up in the designated location.  This duty to remove scrap was made clear to B&K so they could factor it into their bids.
8.  Sometimes, Mr. Wiese would independently come out to the plant to load and remove the scrap trailer.  I have no knowledge of Mr. Wiese using B&K employees for this purpose.
9.  In my deposition, I said I had never seen Mr. Wiese use B&K employees to cut metal "for Mr. Wiese."  What I meant by that is I have no knowledge of Mr. Wiese using B&K employees to cut up scrap <u>for him</u> rather than for B&K as part of a B&K job.  My answer was not intended to imply that no B&K employee ever cut scrap and placed it on Mr. Wiese's trailer, because that happened regularly as part of any B&K job that generated scrap metal.

The court may not disregard an affidavit simply because it conflicts with prior deposition testimony.  <u>Burns v. Board of County Commissioners</u>, 330 F.3d 1275, 1282 (10th Cir. 2003); <u>Franks v. Nimmo</u>, 796 F.2d 1230, 1237 (10th Cir. 1986).  Rather, the court will disregard a contrary affidavit if it serves as an attempt to

create a sham issue of fact to avoid summary judgment. <u>Burns</u>, 330 F.3d at 1282. Factors relevant to the existence of a sham fact issue include whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony, or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain. <u>Id</u>.

The court finds that Johnson's affidavit should be considered in determining this aspect of defendant Wiese's motion for summary judgment. A careful review of Johnson's deposition testimony reveals that the affidavit provides clarification concerning an ambiguity in the deposition. The confusion arose from the following question asked by plaintiff's counsel: Did B&K employees cut up scrap iron for Mr. Wiese? As explained by Johnson in his affidavit, the question fails to properly indicate whether Johnson saw B&K cut up scrap iron for Wiese as part of his separate scrap metal operation or as part of B&K's responsibility in removing scrap metal from IBP/Tyson facilities. The court believes that Johnson's explanation should properly be considered to clear up any confusion that arose from the question in the deposition. However, even if the court did not consider the affidavit, the court would still be forced to enter summary judgment in favor of Wiese because there is no evidence in the record that B&K employees did cut scrap

iron for Wiese as part of his separate scrap iron operation. Accordingly, the court shall grant summary judgment to the defendant Wiese on this claim.

B. DIVERSION OF FUNDS FROM B&K TO WIESE AND MARTINSON

The court shall now consider B&K's second claim. B&K contends that Wiese and Martinson d/b/a Contract Welding conspired to divert funds from B&K through various jobs performed at IBP/Tyson plants. B&K's first allegation of fraudulent activity by Wiese and Martinson involves an ironworker who was purportedly purchased by Contract Welding for B&K. B&K suggests that other fraudulent diversion of monies occurred when Contract Welding billed B&K for goods and services and then subsequently made payments to Wiese. Finally, B&K contends that Contract Welding and Wiese overbilled for services provided by Contract Welding employees at various IBP/Tyson job sites.

The following facts appear uncontroverted in the record concerning the ironworker incident. On October 1, 2002, B&K received an invoice from Contract Welding for an "ironworker and shop equipment" for a total of $6,000. Wiese told Howard that Jeff Johnson wanted an ironworker for his shop and was releasing $6,000 off a time and material job. Contract Welding had two ironworkers and he was going to sell one of them to Johnson. Howard requested that Martinson issue a new invoice for scrap iron and stainless steel. Martinson did so. B&K paid this invoice in the amount of

$6,000 on December 3, 2002.  B&K subsequently received $6,000 from IBP/Tyson.  The ironworker was never utilized.  On May 14, 2003, Martinson refunded $6,000 to B&K.

This claim is extremely puzzling to the court.  Howard has admitted in his deposition that B&K never suffered any loss as a result of this transaction.  B&K does suggest in its response that it was harmed because (1) money was taken out of a job that was not a time and material job, but a bid job; and (2) it was without the benefit of $6,000 for seven months.

A careful review of the factual support reveals nothing to support B&K's claim of conversion or fraudulent diversion.  B&K has suggested that it has a claim here because the explanations offered by Wiese and Martinson on this matter are "far-fetched to say the least."  Even assuming that is true, the court is not persuaded that any legal claim is supported by the facts here.  B&K would have a jury simply speculate about this entire matter.  B&K has failed to come forward with sufficient evidence to support this claim.  As a result, the court finds that Wiese and Martinson are entitled to summary judgment on it.

B&K next contends that Wiese and Martinson conspired to divert monies from it to them.  This allegation concerns several invoices where Contract Welding billed B&K for various items.  B&K notes that Martinson then paid Wiese certain monies for items that were purportedly the subject of the earlier invoices.

10

B&K has laid out the aforementioned circumstances and then suggests that they show a conspiracy to divert funds from it. B&K suggests that Martinson was paying Wiese for non-existent equipment. The court finds insufficient evidence to support B&K's claim. As with the ironworker claim, B&K asks the court to draw inferences from these allegations that lead to fraud or conversion. The court is not prepared to make that leap based upon this flimsy factual record. The court again finds that Wiese and Martinson are entitled to summary judgment on this claim.

C. BREACH OF FIDUCIARY DUTY

Finally, the court shall next turn to B&K's breach of fiduciary duty claim concerning Wiese's formation and operation of a competing business. Wiese contends that he is entitled to summary judgment on this claim on both legal and factual grounds.

The uncontroverted facts on this claims appear as follows: Prior to his employment or during his employment with B&K, Wiese had not entered into an agreement not to compete with B&K upon separation. In November 2002, Howard had a meeting with Wiese and discussed the possibility of selling the millwright division of B&K to Wiese. Howard had decided that B&K should get out of millwright work and focus on masonry. Wiese told him that he would think about it and get back to him. They had no further discussions on the matter. In early 2003, Wiese approached Tyson/IBP engineers and inquired about the possibility of obtaining Tyson/IBP contracts

11

as Wiese Mechanical, Inc., a company he intended to form.  Wiese later attended a meeting at Tyson/IBP headquarters in early May 2003 where issues were raised concerning B&K's ability to complete a job in Perry, Iowa and B&K's ability to timely pay its bills.  Subsequently, prior to his resignation from B&K, Wiese incorporated Wiese Mechanical, Inc.   He began submitting bids on IBP/Tyson projects on the Tuesday following his last day of work with B&K.  After June 2003, B&K has been unable to obtain bids for either millwright or masonry work with Tyson/IBP.

B&K has suggested that Wiese's actions in forming Wiese Mechanical while he was employed by B&K and inquiring about business for Wiese Mechanical while he was employed with B&K constitute breaches of his fiduciary duty to B&K.   Relying upon Burton Enterprises, Inc. v. Wheeler, 643 F.Supp. 588 (D.Kan. 1986), B&K asserts that Wiese violated his fiduciary duty to it to not compete by establishing a competing business without full disclosure.  Wiese contends that Kansas law allows the formation of a business by an employee without notice to the employer prior to termination of the employment relationship as long as the employee does not begin to compete until after the relationship has ended.  Wiese points to Parsons Mobile Products v. Remmert, 216 Kan. 256, 531 P.2d 428 (1975) for support.

The issue raised in this case is addressed in the Restatement (Second) of Agency as follows:

12

> After the termination of his agency, in the absence
> of a restrictive agreement, the agent can properly
> compete with his principal as to matters for which he has
> been employed.  See § 396.  Even before the termination
> of the agency, he is entitled to make arrangements to
> compete, except that he cannot properly use confidential
> information peculiar to his employer's business and
> acquired therein.    Thus, before the end of his
> employment, he can properly purchase a rival business and
> upon termination of employment immediately compete.  He
> is not, however, to solicit customers for such rival
> business before the end of his employment nor can he
> properly do other similar acts in direct competition with
> the employer's business.

Restatement (Second) of Agency, § 393 cmt. e (1958).

In Parsons Mobile Products, the Kansas Supreme Court considered a case similar to this one.  There, a corporation and its directors brought suit against a former president and director of the corporation alleging unfair competition and unlawful trade practices.   Plaintiffs alleged that the defendant had begun a company in direct competition with them.   A jury found for the defendant and the Kansas Supreme Court affirmed.   Although the Court failed to mention the Restatement (Second) of Agency, they used language strikingly similar in establishing the law in Kansas:

> At a time a director or officer is removed or resigns
> from the corporation, his position of trust with the
> corporation is terminated.  It is generally held in such
> cases that even before termination he is entitled to make
> arrangements to compete, except he cannot properly make
> use of confidential information peculiar to the
> corporation's business and acquired therefrom.  Thus, he
> may purchase or initiate a rival business before the end
> of his relationship as an officer or director and upon
> termination of his employment immediately compete.

Parsons Mobile Products, 531 P.2d at 432-33.

13

The Kansas Supreme Court explained the rationale for the aforementioned rule as follows:

> This is a country of free enterprise based upon competition. The essential inquiry on any charge of unfair competition is good faith. Good faith will insulate a former officer or director from liability unless it is shown the rival business was intentionally operated for the purpose and in such a way as to be unfair or detrimental to the former employer-corporation.

<u>Id</u>. at 433.

Thus, while the Kansas Supreme Court did not explicitly adopt the <u>Restatement</u>, we believe that it implicitly did so, and we intend to follow it in this order. The rule set forth in the Restatement has been applied by a number of other courts. <u>See</u>, <u>e.g.</u>, <u>Instrument Repair Svc. v. Gunby</u>, 238 Ga.App. 138, 518 S.E.2d 161, 163-64 (1999); <u>Augat, Inc. v. Aegis, Inc.</u>, 409 Mass. 165, 565 N.E.2d 415, 419 (1991); <u>Operations Research, Inc. v. Davidson & Talbird, Inc.</u>, 241 Md. 550, 217 A.2d 375 (1966); <u>United Aircraft Corp. v. Boreen</u>, 413 F.2d 694, 700 (3rd Cir. 1969); <u>Keiser v. Walsh</u>, 73 App.D.C. 167, 118 F.2d 13, 14 (1941) ("an agent need not wait until he is on the street before he looks for other work"); <u>Bancroft-Whitney Company v. Glen</u>, 49 Cal.Rptr. 825, 411 P.2d 921, 935 (1966); <u>see also Maximus, Inc. v. Thompson</u>, 78 F.Supp.2d 1182, 1190-91 (D.Kan. 1999) (Judge Brown recognizes application of <u>Restatement (Second) of Agency</u> § 393, comment e in case with similar claims).

B&K has suggested that Wiese had a duty to inform it of his

14

intention to leave and compete. We cannot agree. First, the Kansas Supreme Court, in setting forth the rule noted previously on the right of an employee to prepare to compete before he leaves his employer's employment, cited United Aircraft Corp. v. Boreen, 413 F.2d 694 (3rd Cir. 1969) as support. In Boreen, the defendant secretly participated in the formation of a company for the purpose of competing against his employer once he left that employment. The Third Circuit held that this conduct did not violate any fiduciary duty to the employer. Given the Kansas Supreme Court's reliance upon Boreen, we believe it is likely that the court would follow its lead on this issue as well.

Second, and perhaps more importantly, almost every court that has applied Restatement (Second) of Agency § 393 has held that it does not require an employee to reveal to his employer his plans to later compete.

Finally, we are simply not persuaded that the Kansas federal district court cases relied upon by B&K, Burton Enterprises and Fryetech, Inc. v. Harris, 46 F.Supp.2d 1144 (D.Kan. 1999), command a different result. In Fryetech, Judge Marten considered a case where the plaintiff corporation alleged that the individual defendants breached various duties while they were employed by Fryetech. Judge Marten determined that these employees had a duty under Kansas law to inform their employer of their decision to compete in the future. Fryetech, 46 F.Supp.2d at 1155. He reached

15

this conclusion by purportedly relying upon <u>Parsons Mobile</u> <u>Products</u>. <u>Id</u>. Judge Marten stated:  "Good faith, as clearly expressed in other decisions in Kansas, incorporates a duty of disclosure to the employer of the prospective competition." <u>Id</u>. He also suggested that Judge Saffels had applied the same rule in <u>Burton Enterprises</u>. <u>Id</u>. at 1156-57.

In <u>Burton Enterprises</u>, Judge Saffels was faced with a case where a sales representative sought compensation for unpaid sales commission.  His employer, Burton Enterprises, contended that he had violated a fiduciary duty to it by intending to form a competing company prior to termination and by taking steps to accomplish that goal.  Judge Saffels agreed with the employer and found that the employee had violated his duty of service and loyalty to his employer by taking steps to form a competing company while he maintained employment with Burton Enterprises.  <u>Burton</u> <u>Enterprises</u>, 643 F.Supp. at 592-93.

In <u>Fryetech</u> and <u>Burton Enterprises</u>, the courts determined that Kansas law required an employee to inform his employer that he was intending to compete after he left employment.  This court cannot find any basis in Kansas law for this conclusion.  We do not find any support for it in <u>Parsons Mobile Products</u>.  In fact, as suggested previously, the reliance by the Kansas Supreme Court in <u>Parsons Mobile Products</u> on <u>Boreen</u> suggests otherwise.  Moreover, we note that no case law is cited in either <u>Fryetech</u> or <u>Burton</u>

16

Enterprises to support this proposition.  Finally, this court has certainly not found any Kansas cases to support it, and B&K has not cited any such cases.

In sum, the court believes that the Kansas courts would follow the general application of § 393 of the Restatement (Second) of Agency and with it the proposition that an employee does not have to disclose his plans to enter into competition.  In applying the law of the Restatement to this case, we are persuaded that Wiese is entitled to summary judgment on this claim.  Wiese could prepare to compete prior to his termination from B&K.  He did so and the uncontroverted evidence shows that he did nothing more. He did discuss how he could submit a bid with Tyson/IBP and he did have a meeting with Tyson/IBP officials.  However, there is no evidence that he did anything improper during those meetings.  Accordingly, the court does not find sufficient evidence to support any breach of a fiduciary duty by Wiese during his last few months with B&K. The court finds that defendant Wiese is entitled to summary judgment on this claim as well.

II.

In his counterclaim, Martinson seeks payment for services his business rendered for B&K on two job sites.  Martinson seeks damages of $33,210.00 plus interest for these services.  B&K has suggested that it does not owe this amount because of the diversion of funds by Martinson and Wiese in the three years preceding the

17

jobs in question.  B&K further asserts that it has an equitable
right of set-off for any monies that it owes Martinson.  B&K
suggests that Martinson's claim should not be considered until its
claims have been resolved.

In the aforementioned discussion, the court has considered all
of B&K's claims against Martinson.  The court has found
insufficient evidence to support any of them.  Accordingly, the
court believes that it can proceed to Martinson's counterclaim.

With one small exception that the court will address later,
B&K does not dispute any of the bills noted by Martinson.  B&K has
continued to argue that Martinson diverted funds or overbilled, but
as noted previously it has not offered sufficient evidence to
support those contentions.

B&K has suggested that a review of the records show that, in
his bills to B&K, Martinson included a charge of $810.00 for work
performed by Tim Linemann, but there is no indication in
Martinson's bank records that Linemann received payment for that
work.  B&K argues that this matter produces a material issue of
fact on Martinson's counterclaim and precludes the entry of summary
judgment.  The court cannot agree.  The court is not persuaded that
such evidence demonstrates that the work was not performed.  As
pointed out by Martinson, the issue of whether Linemann was
properly paid for his work is a matter between Linemann and
Martinson.  There is no evidence in the record that shows that

18

Martinson did not perform the work that he billed to B&K. Accordingly, the court finds that defendant Martinson is entitled to summary judgment on his counterclaim.

    **IT IS THEREFORE ORDERED** that defendant Wiese's motion for summary judgment (Doc. # 188) be hereby granted.  Judgment shall be rendered for Wiese and against B&K on all claims asserted by B&K.

    **IT IS FURTHER ORDERED** that defendant Martinson's motion for summary judgment (Doc. # 185) be hereby granted.  Judgment shall be rendered for Martinson and against B&K on all claims asserted by B&K.  Judgment shall also be rendered for Martinson on his counterclaim against B&K.  Martinson shall be awarded $33,210.00 plus interest against B&K.

    **IT IS SO ORDERED.**

    Dated this 22nd day of March, 2007 at Topeka, Kansas.

                                    s/Richard D. Rogers
                                    United States District Judge